WILLIAM SCOLLANS *vs.* JAMES J. FLYNN & another.

Suffolk.    Nov. 22, 1875. — May 5, 1876.    COLT & LORD, JJ., absent.

A guarantor and indorser of a check given with his knowledge in payment of a gam-
bling debt, who pays the check to the holder, upon non-payment by the drawee
and protest, cannot recover therefor from the drawer, or a prior indorser.

The payment by A. of B.'s gambling debt, A. knowing it to be such, gives him no
ground of action for the money against B.                   ·                 ,

CONTRACT against James J. Flynn and Mortimer T. Downing
on a check drawn by Flynn, for the sum of $400, upon the Free-
man's National Bank, payable to the order of Downing and by
him indorsed.    The check was also indorsed by the plaintiff.
The declaration contained three counts.    The first count was
against Flynn as maker; the second against Downing as in-
dorser; and the third against Downing for money paid to him
at his request by the plaintiff.    Trial in the Superior Court, be-
fore *Allen*, J., who allowed the following bill of exceptions :

" The plaintiff testified that in August, 1874, he went to the
races at Springfield, and while there on the field, and in sight of
the pool box and the judge's stand, Downing came to him with
the check set out in the declaration, and asked him to cash it,
saying he owed one Barker ; but he said in reply that he had no
money.    He further stated that he never agreed to indorse the
check, but agreed to make it good; that a little while afterwards
he went with Downing to Barker, a seller of pools on the field,
and stated to him that the check was good, and he would make
it good ; and that on the morning of the next day, in pursuance
of his promise to make good, he indorsed it ; and after protest
paid $260.26, the amount due Barker on it, and took it up, and
never claimed more than the amount so paid; that he did not
know what Downing owed Barker for.    It appeared that Down-.
ing lost by his pools to the value of $260 ; that Downing put his
name on back of the check, and passed it to Barker, but he re-
fused to either give him his pools, the change, or the check.    It
further appeared that the next morning, without any further
conferences with Downing, and none at any time with Flynn.
Barker came to the plaintiff and told him to put his name on
the back, and he did so.    The plaintiff also called one Carson,

who testified that the defendant Downing came to him to get him to cash the check, which it was not convenient for him to do, but told Downing that Scollans would fix it.

"At the close of the plaintiff's case, the defendants moved for a nonsuit and to take the case from the jury, on the ground that no case had been made, and that there was no consideration at all for the indorsement; that if it was not so, it was a gaming transaction, and void in law. The judge declined so to rule, and ruled against the defendants.

"The defendant Downing then took the stand, and testified that he bought pools, as then stated ; that he went to the plaintiff and asked him to indorse the check, and he refused to do so ; that the plaintiff refused to cash the check or indorse it, and he never knew of his having indorsed it until some months afterwards, and then repudiated the act.

"The defendants again requested the judge to rule as above stated, and that if the jury believed the transaction was as stated either by the plaintiff or by the defendant Downing, the plaintiff could not recover. But the judge declined so to rule, and instead thereof instructed the jury in substance as follows :

"That if, before Barker took the check, the plaintiff, in the presence and at the request of Downing, said to Barker that he would make it good, and did accordingly indorse the check after Barker had taken it, and afterwards paid the money upon it, he could recover the amount so paid, unless the transaction was tainted with illegality. That the purchase of pools was a gaming transaction, and illegal, and if the check was used for such purchase, and the plaintiff, when he indorsed it, knew or believed that it had been or was to be so used, he could not recover; but if he believed that the check was passed to Barker in payment of a debt due to him from Downing, which had been contracted before the plaintiff took any part in the transaction, he might maintain an action, although it should appear that the debt had in fact been contracted in the purchase of pools, and the plaintiff knew, or had reason to believe, that it had been so contracted."

The jury found for the plaintiff ; and the defendants alleged exceptions.

*G. W. Searle,* for the defendants.

*S. J. Thomas,* for the plaintiff.

AMES, J. By the terms of the Gen. Sts. *c.* 85, § 4, it is provided that "all notes, bills, bonds, mortgages or other securities or conveyances in which the whole or part of the consideration is money or goods won by gaming, or by betting on the sides or hands of persons gaming, or for reimbursing or repaying money knowingly lent or advanced for gaming or betting, or lent and advanced at the time and place of such gaming or betting to a person so gaming or betting, shall be void and of no effect as between the parties to the same, and as to all persons, except such as hold or claim under them in good faith and without notice of the illegality of the consideration." Upon the facts stated in the bill of exceptions, it is manifest that Barker, if he had been the plaintiff, would come within the condemnation of the statute and could maintain no action upon the check declared upon in the first and second counts of the declaration. The selling of pools is admitted to be an illegal and gaming transaction, and the defendant Downing was indebted to him only for pools illegally sold. It appears from the bill of exceptions that the check was delivered to Barker, upon the plaintiff's promise to make it good; but the pools were not delivered, and the transaction was not closed, until Barker had presented the check to the plaintiff, and requested and obtained his indorsement of it. The check, therefore, must be considered as negotiated to Barker by the plaintiff, and Barker received and held it as security for a gaming debt due from Downing to himself.

The question then arises whether the plaintiff stands in any better position. He sues in the first and second counts of his declaration in the capacity of indorsee and holder of the check. As the check considerably exceeded the amount due to Barker, we must infer that the latter accepted it as security for that amount, and that, upon receiving that security, he advanced money of his own, or did whatever was necessary to put the "pool" in the same condition as if Downing had paid for his pools in cash. As the jury were instructed, they were required to find for the plaintiff, if the check was passed to Barker in payment of a debt due to him from Downing which had been contracted before the plaintiff took any part in the transaction, "although it should appear that the debt had in fact been contracted in the purchase of pools, and the plaintiff knew or had

reason to believe that it had been so contracted." But this instruction, in our judgment, cannot be sustained. If the purpose of the transfer and indorsement of the check was to pay to Barker money which he had won by gaming or betting, or to secure to him the reimbursement of money lent or advanced to a person gaming or betting, or lent and advanced at the time and place of such gaming or betting to a person so gaming or betting, the check comes within the prohibition of the statute. It is immaterial whether the debt which it was intended to secure had been previously contracted or not. The question as to the validity of the security which the plaintiff seeks to enforce depends upon the nature of the debt which it was intended to secure, and the plaintiff's knowledge of its illegal nature. If he had such knowledge, he was not a *bonâ fide* holder of the check within the meaning of the statute.

In the third count of the declaration the plaintiff claims not strictly as indorsee of the check, but on the ground that he has paid the sum of two hundred and sixty dollars to Downing's use. That sum appears from the bill of exceptions to be the amount of Downing's losses upon his pools, payable to Barker. Nothing can be clearer than that Barker would have had no standing in court to enforce the payment of these losses, and, as we have already seen, he had no right of action as holder of the check against any person whatever. The plaintiff can acquire no right of action against Downing by paying money which he, Downing, was under no legal obligation whatever to pay. The statute above cited (Gen. Sts. *c.* 85) was intended to make all gaming illegal. *Babcock* v. *Thompson*, 3 Pick. 446. *White* v. *Buss*, 3 Cush. 448. It not only provides that all securities for gambling debts shall be void, except as to *bonâ fide* holders without notice, but by the first section all money, &c., lost at gaming may be recovered back by the loser; or, if he does not prosecute within three months, by any other person who may see fit to prosecute. The money, therefore, paid by the plaintiff to Barker, was not only money which he, Barker, could not have recovered of Downing, but which he could not even hold, after it had been paid. He acquires no such title to it as to make it, in contemplation of law, his money. *Mason* v. *Waite*, 17 Mass. 560. The winner in a gaming transaction can be compelled to pay back his winnings, with the addition of a heavy penalty.

The defect in the instructions given by the learned judge appears to be that he treated the case as if the transaction had been merely a loan of money by the plaintiff to the defendant. If that had been the real transaction, the fact that the defendant intended to use the money in paying a debt previously contracted, which he was not bound to pay, might be immaterial. But upon the facts reported in the bill of exceptions, we cannot fail to see that whatever indorsement the plaintiff furnished and whatever money he paid were furnished and paid to Barker, and not to the defendant, and that for that reason the plaintiff's knowledge as to the nature of the debt so secured or paid was the turning point in the case.          *Exceptions sustained.*