ROBERT H. KEMP *vs.* HAMMOND HOTELS.

Suffolk.    January 12, 1917. — March 27, 1917.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & CARROLL, JJ.

*Gaming. Words,* "Knowledge."

In an action under R. L. c. 99, § 2, against the tenant and occupant of a hotel to recover money alleged to have been lost at gaming in the building with the defendant's knowledge and consent, where there is evidence that the plaintiff entered a room in the defendant's hotel and there bet on a horse race and lost his bet, which was won by other persons present to whom he paid the money, it can be found that the plaintiff lost his money in one of the forms of gaming described in § 1 of the same chapter.

In the same case there was evidence that the plaintiff paid upon his bets $360 in cash and signed a check or note for $5,000, which was unenforceable but which he redeemed by a cash payment before leaving the building after the race had been finished and the money had been won, and it was *held* that the money

with which the check or note was redeemed could be found to have been lost in gaming as much as could the money paid in cash before the wager was determined and therefore that the whole amount could be recovered from the defendant.

In the same case it was *held* that the provision of the statute, making the owner, tenant or occupant of a building liable for money lost at gaming therein "with the knowledge or consent of said owner, occupant, or tenant," did not require the plaintiff to prove that the defendant knew of the gaming by personal observation, and that such knowledge could be found on evidence of notice to the defendant of such circumstances as ordinarily upon investigation would lead him in the exercise of reasonable diligence to a knowledge that gaming was being carried on there.

In the same case, in which the defendant was a corporation, it was *held* that it properly was left to the jury to determine whether the defendant's general manager, by reason of his relation to the business and his control over it, was chargeable with notice of the unlawful use that was being made of the room in which the plaintiff lost his money.

CONTRACT under R. L. c. 99, § 2, to recover money lost in gaming in the building known as the Hotel Essex, at the corner of Atlantic Avenue and Essex Street in Boston, with the knowledge and consent of the defendant as the tenant and occupant of the building. Writ dated January 21, 1914.

The declaration contained four counts. The first count alleged the loss of $360 through the purchase of pool tickets on horse races on October 31, 1913. The second count alleged the loss at the same place on the same day by bets and the buying of pool tickets on horse races of $5,000. The third and fourth counts were the same as the first and second except that the date of the losses was alleged to have been November 1, 1913, instead of October 31, of that year.

In the Superior Court the case was tried before *Sanderson,* J. The material evidence is described in the opinion. At the close of the evidence the defendant asked the judge to order a verdict for it, which the judge refused to do. The defendant then asked the judge to make certain rulings. The first four requests were for rulings that there was no evidence on which the plaintiff was entitled to recover on any one of the four counts. Among the other rulings asked for were the following:

"5. There is no evidence that the defendant, or any one on its behalf, knew or ought to have known of the gambling operations alleged to have occurred in the plaintiff's declaration."

"11. The mere fact that the jury believe that the defendant or

its agents or servants should have known that gaming was being carried on upon its premises is of no avail to the plaintiff; he must go further and show that they actually did know of it.

"12. The mere fact that the jury believe that the defendant or its agents or servants should have known that gaming was being carried on upon its premises is of no avail to the plaintiff; he must go further and show that they actually did know of it; and no matter how unreasonable the defendant's lack of knowledge may appear, the jury cannot from this infer that there was actual knowledge, as such actual knowledge can be found only upon definite evidence to that end."

The judge refused to make the first five rulings requested and refused to make the eleventh and twelfth rulings requested except with the qualifications stated below.

The eleventh ruling as qualified by the judge was given by him as an instruction to the jury as follows:

"The mere fact that the jury believes that the defendant or its agents or its servants should have known that gambling was being carried on upon these premises is not enough. He must go further and show that they actually did know of it, or knew such circumstances as would satisfy a man of ordinary intelligence that gambling was going on in the room or rooms in question."

The twelfth ruling as qualified by the judge was given by him as an instruction to the jury as follows:

"The fact that the jury believed that the defendant or its agents should have known that gambling was being carried on upon its premises is of no avail to the plaintiff unless he proves further that there was actual knowledge of such things as would satisfy a man of ordinary intelligence that gambling was going on in the room or rooms in question. The jury cannot from lack of knowledge infer that there was actual knowledge, and actual knowledge can be found only upon definite evidence tending to show it."

The judge in his charge also instructed the jury as follows:

"It is left to you to decide whether the defendant knew, or the circumstances were such that those in authority knew, that gaming was going on, or knew such facts as would cause a reasonable and prudent man to believe that gaming of the kind testified to by the plaintiff was going on. On that theory and on that theory only can he recover."

The defendant excepted to that portion of the charge of the judge "where it was stated in substance that the knowledge referred to in the statute might be found to exist if the defendant had knowledge of such things as would satisfy a man of ordinary intelligence that gaming was going on in the room or rooms in question."

The jury returned a verdict for the plaintiff in the sum of $6,110.40. After the return of the verdict, subject to the defendant's objection and exception, the judge asked the jury the following question:

"Did you find gaming going on at the hotel with the actual knowledge of the defendant?"

The foreman replied, "Yes."

The defendant alleged exceptions on the grounds stated above.

R. L. c. 99, §§ 1, 2, are as follows:

"Section 1. Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may sue for and recover such money or goods in an action of contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute with effect for such money or goods, any other person may sue for and recover treble the value thereof in an action of tort.

"Section 2. The owner, tenant or occupant of a house or building in which money or goods are lost, paid or delivered in any form of gaming referred to in the preceding section, or by betting on the sides or hands of those gaming, with the knowledge or consent of said owner, occupant, or tenant, shall be liable to an action in the same manner and to the same extent as the winner or receiver thereof is liable by the provisions of the preceding section."

*E. K. Arnold,* (*H. S. Borofsky* with him,) for the defendant.

*J. B. O'Brien,* for the plaintiff.

BRALEY, J.   The first question is whether the plaintiff lost any money at gaming through the use of any of the devices enumerated

in R. L. c. 99, § 1. The jury on his direct examination would have been warranted in finding, that, accompanied by an acquaintance and subsequent participant, he went to the defendant's hotel where they passed to the ninth floor and entered certain rooms, which were connected by a door opening between them. In the first room were a bed, a table and two or three chairs. But on passing through the communicating door, the second room, while bare of all bedroom furniture, was provided with tables, a board on the wall "about six feet square, all tabulated as you see it in a lunch place, with cardboards, with . . . thirty or forty different names which I understood to be horses. On the table as I went in, on the left, was a telephone and wires running from it, and one gentleman sat in behind the table answering the telephone" which rang continuously, or he appeared to the witness to be thus engaged, and "in addition to the telephone on the table" there was a "little telephone on the wall, with a press button." At another table close to the telephone table "was a large black box, a tin box, and on top . . . it was all covered with money." The remaining table in a corner of the room held a ticker in full operation, to which wires and tapes were attached. The plaintiff had been in the presence of this array "ten or fifteen minutes" when, after refreshments had been served by a bell boy who "carried his tray right to the stand where the telephone was," the plaintiff gave to one of the operators $360 in cash, "to play on the race" upon information of another operator who had "called . . . and told him the horse to go in and bet it on." This amount having been handed over, the plaintiff was informed that the "race won't start for quite a few minutes" and upon being asked how much money he could raise and urgently solicited to increase his wager, "I gave him a check for $5,000 on the Brockton Savings Bank to put on the horse. The name of the horse was Alfalfa. I was not familiar with a horse by the name of Alfalfa, and I don't know whether that horse was dead or alive at the time I played on him. The money was placed," the check passed over and a yellow card was given to the first operator "on which to go in and play on the horses . . . the ticker was going . . . the race was called, and the man who went by the name of Miller said 'the horses are ready.'" And on his redirect examination he testified, that he purchased a ticket on a horse and wagered and lost $5,360,

of which $360 was in money and $5,000 in the form of a note or a check drawn "in my own hand" on a savings bank. What further announcements, if any, were made the record does not disclose. Nor is it material. It may be that the whole scene was arranged and staged as a device for the sole purpose of swindling the plaintiff, and that no actual race ever was intended or run. But this question was an issue of fact for the jury. If a prosecution against the operators had been set on foot under R. L. c. 214, § 17, the equipment of the room as described would have been under § 21, "*prima facie* evidence" that the room was "kept or occupied for gaming" as well as the "existence of the race, game, contest or other act or event so purporting or appearing to be referred to." While this rule does not obtain in a civil action, the jury plainly would be justified, if they believed the plaintiff, in finding on his evidence and the legitimate inferences therefrom that he laid a bet on a horse race, lost his bet, and those with whom he bet were the winners. The transaction in all its material aspects is within the wording of the statute, ". . . whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet" giving to the loser the right within three months to sue the winner for the loss. *Grace* v. *M'Elroy*, 1 Allen, 563, 565, 566. We are unable to distinguish a bet on a horse race from a bet on a dog fight or a bet upon a foot race, which were held to be gaming in *Grace* v. *M'Elroy*, 1 Allen, 563, and *Jones* v. *Cavanaugh*, 149 Mass. 124, decided under Rev. Sts. c. 50, § 12, and Pub. Sts. c. 99, § 1, now by subsequent revisions and codifications R. L. c. 99, § 1. See *Commonwealth* v. *Rosenthal*, 195 Mass. 116; *Commonwealth* v. *Sullivan*, 218 Mass. 281.

The second question is what is the amount of the plaintiff's loss for which he can recover under § 1, there being of course no cause of action at common law. The plaintiff, as previously stated, gave different versions of the items comprising the total bet. The first amount of $360 was in cash, but, while saying in his direct evidence that he made a check for $5,000, he subsequently said when recalled, and the jury could find, that he drew the paper himself

"not on check paper," and that he did not know "whether it was a check or a note." *Tierney* v. *Boston Elevated Railway*, 216 Mass. 283. The jury could say the note or check was given and accepted in furtherance of, and in promoting gambling, and being in either form commercial paper founded on an illegal consideration, the note or check as between the parties was not merely voidable but void, and uncollectible by the payee. R. L. c. 73, § 202; c. 99, § 3. *Murphy* v. *Rogers*, 151 Mass. 118. *Bride* v. *Clark*, 161 Mass. 130. *Kennedy* v. *Welch*, 196 Mass. 592, 596. It is of no consequence that the amount represented by the note or check was paid at the hotel to the winners after the betting took place and the race was closed, when the paper was returned to the plaintiff. The money handed over was in settlement of the bet, for there was no legal obligation to be discharged. *Mason* v. *Waite*, 17 Mass. 560, 563. *Scollans* v. *Flynn*, 120 Mass. 271, 274. It moreover was money lost at gaming which the plaintiff could have recovered from the winners. R. L. c. 99, § 1.

But if as against them the plaintiff could have recovered the entire amount, the action is brought under R. L. c. 99, § 2, which provides that "The owner, tenant or occupant of a house or building in which money or goods are lost, paid or delivered in any form of gaming referred to in the preceding section . . . with the knowledge or consent of said owner, occupant, or tenant, shall be liable to an action in the same manner and to the same extent as the winner or receiver thereof is liable by the provisions of the preceding section." And the third question is, whether there is any evidence that the defendant within the meaning of the statute had knowledge of the use which was being made of this portion of its premises.

The jury on all the evidence could find, not only that the room had been equipped and connected with the general telephone service as previously described, and the occupants served with liquors, but, after they had departed, there were holes in the wall of the room half an inch in diameter apparently made by screws or nails, and that the rooms, which had been continuously occupied by the same guests for quite a period, were in charge of the defendant's chambermaid. It also is evident, or at least the jury could have so found, that from the very nature and character of the proceedings, even if conducted behind closed doors, there must have been

pronounced intimations to all in the vicinity from the announcements of the races and the continual ringing of the telephone that the room or rooms were not being used solely as apartments for lodging. The word "knowledge" as used in the statute should not be confined to actual personal observation of what is going on under the owner's roof. If thus limited, gambling in all its forms which the statute is designed to suppress, while in some danger of discovery, generally would be impossible of detection where the occupancy of the wrongdoers acting with great secrecy was of short duration. The word is synonymous with notice of such circumstances as ordinarily upon investigation would lead the owner in the exercise of reasonable diligence to a knowledge of the principal fact. It has been so defined in prosecutions under R. L. c. 208, § 53, for receiving stolen goods knowing them to have been stolen. *Commonwealth* v. *Finn*, 108 Mass. 466. *Commonwealth* v. *Leonard*, 140 Mass. 473, 478, 479. It was for the jury, to whom the question was rightly submitted, to determine whether the defendant's general manager by reason of his relation to the business, and control over it which gave him the opportunity to obtain full information, was chargeable with notice of the unlawful use which was being made of the room or rooms in question. *Hatch* v. *Carpenter*, 9 Gray, 271, 274. *Story* v. *Buffum*, 8 Allen, 35.

It follows from what has been said that the first four requests were denied rightly, and that the eleventh and twelfth were properly modified, while the instructions as to the defendant's knowledge are unexceptionable.

*Exceptions overruled.*