State ex rel. McKeever v. Cameron, 179 Wis. 405.

STATE EX REL. McKEEVER, Appellant, vs. CAMERON, County Clerk, Respondent, and JOHNSON, interpleaded, Defendant.

*January 13—January 17, 1923.*

*Elections: Constitutional amendment permitting sheriffs to succeed themselves: Votes cast for present incumbent: Effect if amendment fails: Vacancy in office.*

1. It is presumed that the electors, at a general election at which there was submitted for ratification a constitutional amendment proposing to make sheriffs eligible for re-election, knew that the constitutional amendment was pending.

2. When votes are cast for one who, to the knowledge of the voters, cannot possibly hold the office, the votes are nullities and cannot be counted; but where a constitutional amendment allowing sheriffs to succeed themselves was voted on on the same day that county officers were elected, voters who cast their ballots for a candidate for sheriff who, if the constitutional amendment were passed and if he received the highest number of votes, would have been elected, did not act in bad faith in voting. *State ex rel. Bancroft v. Frear,* 144 Wis. 79, distinguished.

3. Since the amendment did not pass, the defendant, although he received the highest number of votes cast, was ineligible to succeed himself as sheriff; but votes cast for him are counted, and the relator, who received the next highest number of votes but not a plurality, was not elected.

4. At the expiration of defendant's present term there was a vacancy in the office to be filled according to law.

ESCHWEILER, J., dissents.

APPEAL from an order of the circuit court for Washburn county: W. R. FOLEY, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Fuller & Lampson* of Cumberland, and oral argument by *F. L. Lampson.*

For the defendant *Johnson* there was a brief by *W. T. Doar* of New Richmond and *S. A. Barrett,* district attorney of Washburn county, and oral argument by *Mr. Doar.*

The following opinion was filed January 17, 1923:

PER CURIAM. The following propositions are decided in this case:

1. That it should be presumed that the voters of Washburn county had knowledge of the constitutional amendment pending at the time of the late election proposing to make sheriffs eligible for re-election.

2. If the constitutional amendment had passed, the defendant, having received the highest number of votes, would have been eligible to hold the office of sheriff for a second term.

3. It cannot be held that the votes cast for the defendant were cast in bad faith; and the fact that he was ineligible at the time of the election did not under the facts of this case render void the votes cast for him.

4. Following former decisions of this court, the relator, although he received the next highest number of votes, was not elected, and there is now a vacancy in the office of sheriff of Washburn county.

5. The order of the circuit court quashing the alternative writ and dismissing the proceedings, with costs, is affirmed.

The following opinion was filed February 6, 1923:

JONES, J. This is an action in *mandamus* to compel the respondent *Cameron,* county clerk of Washburn county, to certify the relator, *McKeever,* as the duly elected sheriff of Washburn county. Defendant *Johnson* was interpleaded.

The petition stated that *Johnson* was elected to the office of sheriff of Washburn county in November, 1920, and was the sheriff at the time of the filing of the petition; that at the general election in November, 1922, 1,265 votes were cast for him for the office of sheriff to succeed himself; that under a constitutional provision that had been the law for many years he was ineligible to succeed himself. There were allegations in detail setting forth the publicity this subject had received and that his disqualification was well known to the voters of Washburn county; that the Washburn county clerk had declared his intention to certify the election of *Johnson* to the office of sheriff; that the relator, *McKeever,* received 597 votes, the highest number of votes cast at the election for any person eligible to qualify for the office; that the county clerk had refused to certify petitioner's election. It was prayed that the county clerk be enjoined from certifying the election of *Johnson* and that a writ of *mandamus* issue commanding the county clerk to certify the election of *McKeever.*

The alternative writ of *mandamus* was issued and the defendants demurred and moved to quash the writ. The motion to quash the alternative writ was granted.

Since the early history of the state there has existed the constitutional provision that sheriffs shall be chosen by the electors of the respective counties once in every two years and as often as vacancies shall happen; that they shall hold no other office and shall be ineligible for two years next succeeding the termination of their office. Sec. 4, art. VI, Const.

It was stipulated by counsel that in June, 1921, the legislature duly passed a joint resolution proposing to amend this section so that sheriffs may succeed themselves and that the proposed amendment was submitted to the voters of the state and of Washburn county at the general election in November, 1922, and that due notice was given to the electors of the county, whereby they were expressly notified that if the proposed amendment were ratified by the people sheriffs would be permitted to succeed themselves. The proposed amendment had also been proposed and agreed to by a majority of the legislature in the session of 1919.

It is the contention of the relator that since the amendment had not been adopted when the votes were cast for the candidates, the person then holding the office was ineligible as a candidate to hold the office even though he received the highest number of votes.

It is further argued that this provision of the constitution was well known to the voters; that those who voted for *Johnson* voted in bad faith; that their votes should not be counted; and that since the relator received the next highest number of votes he was duly elected.

Counsel for relator rely on *State ex rel. Bancroft v. Frear,* 144 Wis. 79, 128 N. W. 1068. In that case the following facts appeared: During a campaign in which factional lines were closely drawn, five days before the primary election, and after the ballots therefor were printed, a candidate for the nomination for the office of attorney general came to his death by drowning. The fact of his death was published generally in the newspapers throughout the state, which further stated that if he received a plurality of votes at the primary the state central committee could fill the vacancy. Such statement was repeated in certain letters sent to many parts of the state and in numerous telegrams sent to supporters of one faction, calling upon them to urge voters to vote for the decedent notwithstanding his death.

It was held that from these facts, admitted on demurrer, the court would infer that of the 63,482 votes cast for the decedent more than enough to give him the plurality of 5,286 which he received were cast by persons who knew that he was dead.

In that case it was claimed by the defendant that the provisions of the general election law relating to the filling of vacancies caused by declination, death, or other disability of a nominated candidate were imported into the primary election law or made applicable to primary elections; but the court did not adopt this view, and held that the death, before a primary, of one of several candidates for a party nomination at such primary does not create a vacancy which can be filled by the party committee either before or after such primary.

The statute (sec. 18, ch. 451, Laws 1903) provided that:

"The person receiving the greatest number of votes at a primary as the candidate of a party for an office, shall be the candidate of that party for such office, and his name as such candidate shall be placed on the official ballot at the following election."

It was held that a dead man is not a "person" within the meaning of this statute, and that the relator was the "person" who received the greatest number of votes at the primary. It is undoubtedly the rule of this case that when votes cast for one who, to the knowledge of the voters, cannot possibly hold the office, the votes are nullities and cannot be counted. In the days before woman suffrage, Lord DENMAN, Chief Justice, said:

"No one can doubt that, if an elector would nominate and vote only for a woman to fill the office of mayor or burgess in parliament, his vote would be thrown away: there the fact would be notorious, and every man would be presumed to know the law upon that fact." *Gosling v. Veley,* 7 Adol. & El. N. s. 406, 439, 53 Eng. Com. Law, 406.

The same rule would apply, as suggested by Lord CAMP-BELL, if the votes were cast for a fictitious person, as the "man in the moon" (*Reg. ex rel. Mackley v. Coaks,* 3 El. & Bl. 249), or it would apply to the many votes cast at the last election for the celebrated "Andy Gump."

The case at bar presents quite a different situation. *Johnson,* the defendant, was a very live person, of real flesh and blood, who received 668 more votes than the relator.

The electors are presumed to have known of the constitutional provision. They are presumed to have known of the proposed amendment on which they were to vote on the same day on which the county officers were to be elected. This and several other proposed amendments had been given wide publicity in the press and had been subjects of general discussion among the electors. Legal notice of the vote to be taken was given and it contained these words: "If this proposed amendment is ratified by the people, sheriffs will be permitted to succeed themselves."

The proposed amendment failed of passage, and it is well settled under several decisions of this court that the defendant is ineligible to hold the office. *State ex rel. Knutson v. Johnson,* 171 Wis. 521, 177 N. W. 899; *State ex rel. Pluntz v. Johnson,* 176 Wis. 107, 184 N. W. 683, 186 N. W. 729; *State ex rel. Off v. Smith,* 14 Wis. 497.

The question remains to be determined whether the votes cast for him were to be counted for any purpose. If they are to be treated as nullities, the relator, having received the next highest number of votes, was entitled to be certified as the duly elected sheriff. In *State ex rel. Bancroft v. Frear,* 144 Wis. 79, 128 N. W. 1068, Mr. Justice BARNES said in the opinion (p. 87):

"It is well settled that where electors vote for an ineligible candidate without knowledge of his disqualification, and such candidate receives a plurality of the votes cast, his disqualification does not result in electing the candidate

receiving the next highest number of votes.    In such a case the votes cast for the ineligible candidate must be counted, and there is a vacancy in the office instead of an election of the candidate receiving less than a plurality of the votes."

In *State ex rel. Off v. Smith,* 14 Wis. 497, one who was an alien both at the time of election and the beginning of the term of office was held ineligible to hold the office of sheriff, and it was also held that the person receiving the next highest number of votes was not elected.    In *State ex rel. Schuet v. Murray,* 28 Wis. 96, it was held that where one was disqualified as an alien at the time of the election but became a citizen before the beginning of the term, he was entitled to hold the office of clerk of the county board of supervisors; that the disqualification did not relate to the *election* but to the *holding* of the office.

Mr. Justice LYON expressed it as his personal view that the same rule would apply to minors and to those who had not been residents of the state for the requisite time if in other respects they were qualified electors, provided the disqualification existing at the time of the election should be removed before the beginning of the term for which they were elected.

This decision, as to the real question involved, was approved in *State v. Trumpf,* 50 Wis. 103, 5 N. W. 876, 6 N. W. 512, and in *State ex rel. Schommer v. Vandenberg,* 164 Wis. 628, 160 N. W. 1037.

It is contended by counsel for relator that in these cases the voters did not know of the ineligibility of the candidates at the time of the election and that the *Bancroft-Frear Case* is controlling; that the electors knew when they cast their votes that *Johnson* was ineligible and could only guess whether the proposed amendment would be ratified; that such votes were "gambling" votes and were cast in bad faith.

We are not disposed to adopt the view that we should presume that 1,265 voters in a rather thinly settled county

acted in bad faith in voting for *Johnson* under the circumstances which have been stated. We are rather disposed to presume that the mass of voters of Washburn county voted with a due appreciation of the importance of the elective franchise, one of the most cherished privileges of the American citizen.

Those who voted for *Johnson* doubtless believed like many thousand other voters of the state that the proposed amendment would be ratified by the people and they believed that the candidate of their choice could hold the office of sheriff. We find in their conduct none of that wilfulness which might constitute bad faith. They were disappointed in their expectations, but their votes are not to be rejected as mere blank paper. They were votes to be counted. If the proposed amendment had been ratified by the vote of the people, the disqualification of *Johnson* to succeed himself would have been removed. The proposed amendment failed of adoption and he was not eligible to hold the office.

Since the relator did not have a plurality of the votes cast he could not, under the decisions already referred to, gain title to the office. It follows that on the expiration of *Johnson's* term there was a vacancy in the office to be filled as provided by law.

*By the Court.*—Order affirmed.

The following opinion was filed March 6, 1923:

ESCHWEILER, J. (*dissenting*). In this case the votes cast by the majority of electors of Washburn county for sheriff are held to be legal though ineffective votes. They were cast, however, by persons who knew at the time they so voted that the declared public policy of the state by constitutional provision had made the defendant *Johnson*, then sheriff, ineligible for election to succeed himself. They knew that such ineligibility would continue so as to make him ineligible to qualify unless and except at the very same

election the majority of the voters throughout the state should overturn such constitutional provision and public policy, and in this important regard this case is distinguished from any cases cited or found. In so voting for defendant *Johnson* they were gambling as to the result at the same election on the proposed constitutional amendment fully as much as though they wagered their money as well as their votes upon the result.

Art. III of the constitution covers the subject of suffrage, and sec. 6 thereof, which has been unchanged since the original adoption, provides as follows:

"Laws may be passed . . . depriving every person who shall make or become directly or indirectly interested *in any bet or wager depending upon the result of any election from the right to vote at such election.*"

By sec. 2, ch. 6, R. S. 1849, it was provided:

"Nor shall any person who shall have made or become directly or indirectly interested in any bet or wager, depending upon the result of any election at which he shall offer to vote, *be permitted to vote at such election.*"

This has remained since then continuously in effect with but slight modification of language and now appears as sub. (5), sec. 6.01, Stats. Similar views as to public policy regarding betting on elections are found in other states. 20 Corp. Jur. 280, 294.

This court has heretofore been very solicitous as to this public policy, and as stated in *State ex rel. Newell v. Purdy,* 36 Wis. 213, 224, "warned by the experience and the wisdom of centuries," it has steadfastly sought to uphold popular elections free from any taint of corruption and from all improper or unlawful influences whatever. This case just cited held that the promise to serve at less than the lawful salary, thereby donating to the county the difference, would render the votes cast for the person making such offer by persons knowing of and influenced by such offer

illegal votes.   The same doctrine is recognized in *State ex rel. Dithmar v. Bunnell,* 131 Wis. 198, 208, 110 N. W. 177.   See, also, L. R. A. 1917B, note at p. 191.

An early decision, *Murdock v. Kilbourn,* 6 Wis. 468, was upon the following: One M. deposited $50 with Byron Kilbourn (who it is safe to assume was the one-time mayor of the city of Milwaukee) ; one S. deposited an equal amount with the same stakeholder.   The understanding was evidenced by a written memorandum that it was a wager dependent on the result of the gubernatorial election, the $100 to be delivered to the winning party; M. staking his that Barstow would be elected, and S. that Bashford would be elected.   M. sued Kilbourn for the $100.   The court, by Mr. Chief Justice WHITON, disposed of the issues presented very summarily by stating that the wager which plaintiff and S. made was unlawful: "A most pernicious influence would be exerted upon our institutions of government if the elections which the people make of their public officers should be made the instruments and the occasion of gaming.   Hence, the courts of all our sister states have uniformly held such contracts to be contrary to the public policy of our laws, and consequently illegal."   That the defendant was a stakeholder made no difference; there could be no recovery as against him even if, as the court said, the stakeholder had fraudulently appropriated the money to his own use.

Subsequently, by statute, recovery was permitted by either party of the amount wagered, as stated in *Simmons v. Bradley,* 27 Wis. 689, wherein, however, it is declared that all such provisions are for the purpose of repressing and discouraging gaming in every form, including bets and every variety of wager contracts, as being pernicious in their tendency and destructive of good order and sound morality.   Page 692.

Though it may be matter of common knowledge that this early declared and persistent public policy has been flagrantly

and openly violated, yet that ought not to be deemed suffi-
cient reason for such declared public policy being overlooked
or overruled by judicial decision.

It cannot be doubted that the voters of Washburn county
interested in the candidacy of the defendant *Johnson* were
necessarily directly interested in the result at the same elec-
tion upon the proposed amendment, and the records disclose
the vote to be:

| | |
|---|---|
| For Johnson .......1,265 | In the state at large the pro- |
| For relator ......... 597 | posed amendment was de- |
| | feated by a majority of |
| For the constitutional | 45,762, the vote being |
| amendment ....... 984 | 161,832 for and 207,594 |
| Against the amendment 638 | against it. |

The defendant *Johnson* and those voting for him may
well have applied to them the language of the New York
court of appeals when, referring to one ineligible by con-
stitutional provision to hold office, it said in the recent case
of *Matter of Lindgren,* 232 N. Y. 59, 133 N. E. 353, in
quoting with approval from a prior decision: "He violated
the constitutional provision in seeking the votes of the elec-
tors, and they violated it in voting for him."

Not only has betting on elections been made the sub-
ject of disqualification of the voter as directed by the con-
stitution as above stated, but it has been expressly included
as an offense against public policy condemning lottery and
gambling as found in the many provisions of ch. 185 of
the Statutes, entitled "Offenses against Public Policy, Lot-
tery and Gambling," and most of which have been in exist-
ence since the organization of this state. Sec. 4535, Stats.,
punishes any person who shall lose or win any money, prop-
erty, or thing in action by gambling or betting upon any
election or on the issue or event thereof. Sec. 4538, Stats.,
makes promises and agreements, where the whole or any
part of the consideration of such promise or agreement shall

be for money or other valuable thing won or lost, laid or staked, or betted on any wager, absolutely void. This court has steadily upheld that public policy in letter and spirit.

Neither gaming grain contracts nor compromises of differences arising therefrom will give either party any standing in a court of law. *Everingham v. Meighan,* 55 Wis. 354, 13 N. W. 269; *Carson v. Milwaukee P. Co.* 133 Wis. 85, 113 N. W. 393.

Neither money nor merchandise advanced with knowledge of their use in games of poker can be the lawful basis of an action. *Schoenberg v. Adler,* 105 Wis. 645, 81 N. W. 1055; *Olson v. Sawyer-Goodman Co.* 110 Wis. 149, 85 N. W. 640. See note L. R. A. 1918C, 249.

That commercial paper on any such illegal consideration is not merely voidable but void, see *Kemp v. Hammond Hotels,* 226 Mass. 409, 415, 115 N. E. 572.

In *State ex rel. Bancroft v. Frear,* 144 Wis. 79, at page 91 (128 N. W. 1068), it was squarely held that the purpose, in the eye of the law, of an election is to *elect,* not to create vacancies to be filled by appointment or subsequent election nor merely to defeat one of the candidates. Since that announcement there have been no statutory changes and none in the judicial view until the present opinion, so clearly, in my judgment, contrary to the letter and spirit of that holding.

No authority has been cited nor can I find any which supports the result here reached, viz. that votes are legal when solicited by and given to one who is known to be ineligible by constitutional mandate; when the public policy so declared continues unchanged; when he who solicits and those who vote for him know at the time that they must, in order to win, gamble upon the result to be reached upon another issue at the same election; and when, if they had gambled their money as they did their votes, they could have been

disfranchised. Yet here, though they gamble and lose, nevertheless they win.

Under practically all the authorities, votes cast in wilful defiance of the law are illegal and cannot be counted. 9 Ruling Case Law, 1126. Such, it seems to me, were the votes here in question and they should not have been counted. A possible high or holy purpose or motive in thus voting ought no more to make the votes legal than did the declared purpose in *State ex rel. Bancroft v. Frear,* 144 Wis. 79, 128 N. W. 1068, make the votes there legal and thereby permit of appointment, or than would an expressed purpose to dedicate to charity money won on betting on an election or on a horse race validate such bets.