HOLT LUMBER COMPANY, Respondent, vs. DULUTH, SOUTH SHORE & ATLANTIC RAILWAY COMPANY, Appellant.

*October 15—November 10, 1931.*

78

For the appellant there was a brief by *Powell & Sprowls* of Superior, and oral argument by *John S. Sprowls.*

For the respondent there was a brief by *Allan V. Classon* of Oconto, attorney, and *Jerome R. North* and *Frederick N. Trowbridge,* both of Green Bay, of counsel, and oral argument by *Mr. Classon* and *Mr. North.*

FOWLER, J. The defendant was engaged in interstate commerce and was subject to the Interstate Commerce Act. The act prohibits receiving from any person greater or less

compensation for service rendered than it charges others, or the giving of undue preference or advantage to any particular person; or giving or accepting any rebate or discrimination or adopting any device whereby a road shall receive a less rate than that shown in its published tariffs; or extending to any shipper any privileges or facilities in transportation except as specified in such tariffs. 24 Stat. 379; 32 Stat. 847; 34 Stat. 584. While the original act was the only one in force when the 1902 contract was made, that contract was subject to all provisions subsequently enacted by amendment while the parties were operating under it. *Louisville & N. R. Co. v. Mottley,* 219 U. S. 467, 31 Sup. Ct. 265.

As unmistakenly stamping the contract as invalid it may be said that the plaintiff, as part of the original agreement, gave the name "Baltimore River Railroad" to the six miles of road from plaintiff's camp at the end of it to the defendant's road; gave the name "Urquhart" as a railroad station to plaintiff's camp; gave the name "Baltimore" as a station to the point where it joined defendant's main line; suggested $4 per M. to be posted as a joint rate by the defendant and the Milwaukee road for transporting logs from Urquhart to Oconto; suggested that plaintiff prepay $1.50 for transportation on the Baltimore Railroad, that defendant have $1 for transportation from Baltimore to the Milwaukee road junction and the latter road to have $1.50 for its part of the transportation, and that the $2.50 be paid by plaintiff at Oconto. Such a tariff was published and kept posted nearly five years, during which the plaintiff paid the $2.50 at Oconto and did not pay the $1.50. Under the contract the plaintiff was to procure the right of way for the six miles of road from Urquhart to Baltimore, grade it and furnish ties for its construction and to construct and operate connecting spur tracks, and give to defendant the business of transporting its logs. The defendant was to furnish rails and railroad iron and lay and ballast the six miles, operate trains on it as re-

quired for plaintiff's business and take cars delivered from plaintiff's spurs; to furnish rails and railroad iron for construction of the spurs; to furnish coal to plaintiff for its engines on its spur tracks at cost to defendant plus seventy-five cents freight for transporting it; to haul plaintiff's loader free; to haul ties needed by plaintiff for spurs free within forty miles and loan a hand-car and push-car for plaintiff's use on its spurs. If plaintiff requested defendant to furnish ballast or use of equipment for construction of its spurs, defendant was to charge only actual cost of the labor and material. The six miles of road and the spurs were built and operations were carried on according to the terms of the contract for several years. In May, 1907, a rate of $2.50 from Baltimore to Oconto was published and in 1919 the parties signed a lease of the railroad iron used by plaintiff, stipulating a rental for its subsequent use. No other changes in course of business between the parties appear until after plaintiff ceased logging operations in the territory in 1920 and wished to resume them in 1923, when the defendant refused to recondition and operate the six miles of road. That the contract violated the Interstate Commerce Act is clear, and this conclusion is supported by numerous decisions of the federal courts, which are conclusive upon federal questions, among which may be cited *Taenzer & Co. v. Chicago, R. I. & P. R. Co.* 191 Fed. 543; *Central of Georgia R. Co. v. Blount,* 238 Fed. 292; *U. S. v. Union S. Y. & T. Co.* 226 U. S. 286, 33 Sup. Ct. 83; *Chesapeake & O. R. Co. v. Westinghouse C. Co.* 270 U. S. 260, 46 Sup. Ct. 220.

The original contract being invalid under the act, that action does not lie to enforce it or to recover damages for breach of its terms is fundamental. It is equally true that, being invalid, an action brought upon it is not a subject of compromise and action will not lie upon an agreement to compromise and settle it. To support these propositions there is no need to go beyond the decisions of this court.

*Everingham v. Meighan,* 55 Wis. 354, 13 N. W. 269, holds squarely that claims based upon contracts clearly illegal may not be compromised. That case involved transactions based upon future prices of grain constituting gambling operations, but all transactions against public policy must stand on the same basis in this respect. The ruling of the *Everingham Case* is affirmed in *McMillan v. Barber Asphalt P. Co.* 151 Wis. 48, 53, 138 N. W. 94, and *State ex rel. McKeever v. Cameron,* 179 Wis. 405, 416, 192 N. W. 374.

Two Wisconsin cases are relied upon by respondent in support of its contention that a suit based upon a compromise of a claim based on a contract violative of a statute is tenable. One is *Galusha v. Sherman,* 105 Wis. 263, 81 N. W. 495. The suit which was settled was to recover damages for sale of unwholesome meat. It does not appear that any statute was violated or claimed to have been violated. It was a simple tort action, subject to settlement like any other tort action. The other is *Continental Nat. Bank v. McGeoch,* 92 Wis. 286, 66 N. W. 606, in which two of the five members of the court dissented. In that suit a compromise was made of claims against a commission firm by McGeoch, a member of the firm, and Wells, who was not a member of it, and brokers and the bank who were creditors of the firm. Wells and McGeoch had combined to corner the lard market. The opinion recites that such an attempt was illegal. There was a jury finding that the plaintiff when it agreed to the compromise knew that the firm was engaged in an attempt to corner the market, but did not know that the money loaned to the firm by the bank was to be used by the firm in furthering such attempt. The court says:

"Such want of knowledge on the part of plaintiff seems to have been regarded as essential to bar the defense of illegality upon the merits."

Whether such want of knowledge was essential or not, it manifestly served to relieve the plaintiff's claim of any pos-

sible taint of illegality, and there was no occasion to treat or discuss the compromisability of illegal claims, and no occasion to make the statement next following, that—

. . . "To support the compromise . . . it was only essential that there was ground for claiming in good faith that the transaction was illegal."

The statement was not only *obiter,* but it seems to have been carelessly made, as there is no reference to the prior case of *Everingham v. Meighan, supra.*

The plaintiff stands and the trial court rested its decision upon the proposition that—

. . . "the illegality of the original contract of 1902, as modified by the contract of 1919, was at least a doubtful question, *dependent upon disputed facts,* and the compromise of a claim of doubtful legality is valid."

The trial court found that the legality "was doubtful and dependent on disputed facts." But there was no dispute regarding the facts upon which the legality of the contract rested. The legality of the contract is purely a matter of law.

The ownership of the six miles of road seems to have been considered as a question of fact by the trial court, but that in final analysis is a question of law dependent on facts not at all in dispute. One of the premises on which the conclusion of the trial court rests being false, the court's conclusion falls with the premise.

The plaintiff seeks to meet defendant's contention that its suit was not subject to compromise by urging that the 1919 agreement removed all taint from the 1902 agreement and rendered it valid and enforceable. It is perhaps sufficient in answer to this to quote from *McMillan v. Barber Asphalt P. Co., supra,* p. 53 :

"If a connection between the original illegal transaction and a new promise can be traced, no matter how many times and in how many different forms it may be renewed, it can-

not form the basis of a recovery. Repeating a void promise cannot give it validity. So every new agreement in furtherance of or for the purpose of carrying into effect any of the unexecuted provisions of a previous illegal contract is likewise illegal and void." See 13 Corp. Jur. p. 509, § 460.

But the 1919 agreement shows on its face that it does not validate the original agreement. It is in form a lease of rails and railroad iron, providing a rental therefor. It provides for rentals from December 31, 1918, on, but makes no provision for payment of use from 1902 to that date. It says nothing about ownership of the six miles of road, and nothing about a tariff for transporting logs thereon although the published tariff in force at the time was from Baltimore to Oconto and that was the only tariff ever paid by plaintiff, and although plaintiff's claim rests on the hypothesis that the defendant owns this road. It would seem that to validate the original contract, were this possible, on the hypothesis of defendant's ownership of this road, provision should have been made for plaintiff's paying not only rental for use of railroad iron on its spurs not only from 1919 on but from thence back to 1902, and for paying for transporting plaintiff's logs on the six miles of road both before and after 1919 and paying it for the other transportation service provided for in the original contract. The defendant carried plaintiff's logs on the six miles of road from January, 1919, until plaintiff ceased operations at close of the 1920 season as well as before that time without compensation therefor. Moreover, the instrument shows that the plaintiff was insisting that the original agreement was still in force even as to nonpayment of rental for rails; for it provides that if it should be finally determined by a court of competent jurisdiction that the 1902 agreement was valid the plaintiff should not be liable to pay the stipulated rentals. Manifestly the only change of the original agreement made or contemplated was in respect of rental for rails and even that change was con-

ditional on court action. This fell far short of overcoming all illegal features of the original contract.

Defendant's contention that the original action is not subject to compromise being upheld, there is no need to consider its further contentions (1) that no agreement of compromise was ever reached and (2) that the general solicitor and general manager of the road had no authority to bind the defendant by their agreement to compromise.

*By the Court.*—The judgment of the circuit court is reversed, with directions to dismiss the complaint.